No. 82-417

IN THE SUPREME COURT OF THE STATE OF MONTANA

1983

MAY GRIMSLEY, DAVID GRIMSLEY,
EVA OXARART, LILLIAN BOOS, and
FAYE SEEL,

                    Plaintiffs and Appellants,

     -vs-

ESTATE OF WILLIAM R. SPENCER,
Deceased,

                    Defendants, Respondents and Cross-appellants.

APPEAL FROM:  District Court of the Seventeenth Judicial District,
              In and for the County of Phillips,
              The Honorable B. W. Thomas, Judge presiding.

COUNSEL OF RECORD:

     For Appellants:

          Leaphart Law Firm, Helena, Montana

     For Respondents:

          Robert L. Johnson, Lewistown, Montana

                              Submitted on Briefs:  June 16, 1983
                                         Decided:  October 6, 1983

Filed:    OCT 6 - 1983

              _Ethel M. Harrison_
_____
                    Clerk

Mr. Justice L.C. Gulbrandson delivered the Opinion of the Court.

This is an appeal from a decision of the District Court of the Seventeenth Judicial District, Phillips County, the Honorable B. W. Thomas presiding in his capacity as District Judge and water judge, decreeing a first right to the plaintiffs to the use of 500 miner's inches of water of Dog Creek in southern Phillips County and an easement for an irrigation system in conjunction with that right; denying plaintiffs a prescriptive right to the remaining waters of the creek; and denying injunctive relief against the defendants for engaging in certain activities with respect to the creek and plaintiffs' irrigation system. Plaintiffs appeal from that portion of the decree denying them a prescriptive right to 1,000 miner's inches. Defendants cross-appeal from the grant of 500 miner's inches to plaintiffs. For the reasons stated below, we affirm the judgment of the lower court with respect to both appeals.

Plaintiffs and defendants have been embroiled in a six-year legal dispute over the use of waters from Dog Creek, which is located near the Sun Prairie community in southern Phillips County. The plaintiffs own a 160 acre tract of land, designated as the Northeast Quarter of Section 22, Township 24N., Range 31 E. M.M. The tract was originally owned by William R. Spencer, a relative of defendants. Spencer entered the area as a squatter prior to 1899, made a desert entry claim on the tract in 1901, and successfully proved-up in 1905. Spencer remained on the land until 1924, when the tract was lost in a foreclosure action. The land was subsequently purchased by Sherman

Grimsley, a relative of plaintiffs, and has been in their family since 1924. Substantially all of the land is irrigable, and hay crops have been harvested thereon continuously since 1901.

Defendants own two tracts of land adjacent to the plaintiff's tract on the north and east. Dog Creek is an intermittently flowing stream arising in the Larb Hills, located to the east of plaintiffs' and defendants' land. The waters of the creek flow westerly through or near the described lands. Generally, the creek flows from melting snow and early rains in March and April, and again in June from rain. Occasionally, it will flow at other times during the year from heavy rains. Its waters are run-off surface waters.

On April 22, 1899, William R. Spencer claimed 500 miner's inches of water from Dog Creek through the use of a dam and ditch, for the purpose of irrigating the 160 acres of the Northeast Quarter. He filed a notice of appropriation, as required by law. His notice was filed with the clerk and recorder of Valley County (which at that time included the area now known as Phillips County) on April 22 and was recorded in Book 6 of Water Rights, page 80, records of Valley County. He proceeded diligently to divert and apply his claim to the Northeast Quarter. From the evidence produced at trial, it is clear that irrigation of the tract has continued virtually without interruption since 1901. The dam and ditch constructed by Spencer, and improved and maintained by Sherman Grimsley and the plaintiffs, are located on those tracts owned by defendants. Defendants also make use of the waters of Dog Creek, relying

on claims filed subsequent to Spencer's in 1916 and 1920. Although measuring devices have never been used on the creek, evidence produced at trial suggested that the estimated capacity of the Dog Creek channel was approximately 1,500 miner's inches.

A county road runs from north to south along the east line of the Northeast Quarter, effectively separating the properties of plaintiffs and defendants and cutting across Dog Creek at about the point where William Spencer and the plaintiffs have diverted the waters of the creek. For many years, the road just ran through the creek. In 1954, however, the county constructed a high grade across the creek near the diversion point. The county installed three culverts, one to handle the Dog Creek channel at the north end of the grade, and two smaller culverts on the south end to accommodate the plaintiffs' water right. Plaintiffs connected to the southerly culverts by adjusting their ditch from the creek east of the high grade toward the west to the middle culvert, and west again away from the culvert to the Northeast Quarter. Under this system, the plaintiffs are served by the middle culvert. During times of excess flow, Dog Creek water flows toward the north culvert and spreads out, in part, flowing southwest toward the Northeast Quarter.

Between 1924 and 1948, Sherman Grimsley and the plaintiffs constructed holding and spreading dikes to manage and allocate the waters on their lands. Plaintiffs have always used all the waters flowing into this system until their needs are satisfied, after which any excess waters are released and allowed to flow on to lands owned by their

-4-

neighbors, who have come to depend upon the excess flow. This system, which is apparently known to all residents of the Sun Prairie Community, has generally worked well since William Spencer first diverted Dog Creek over eighty years ago.

The seeds of the current dispute appear to have been planted after construction of the high grade in 1954. A process of silting commenced in the plaintiffs' ditch on the east side of the middle culvert, and weeds eventually started to grow in the silted area. In 1971, one of the defendants, Vance Spencer, cultivated the area to eradicate the weeds, and planted it with grass and alfalfa. He replanted the area in 1972. Unfortunately, Spencer's efforts had the effect of diverting water in the ditch northward away from the middle culvert, which serves the plaintiffs' tract. During the period 1974 to 1976, plaintiffs, on at least two separate occasions, attempted to enter the area and repair the ditch, but defendants denied them entry. In late 1976 and early 1977, the plaintiffs entered the land despite defendants' objections and restored the ditch. Defendants did not resist this entry or otherwise interfere with the work. Before repairs were completed, however, the run-off waters had gone down the channel created by Vance Spencer's cultivation and away from the middle culvert. There was no additional run-off and the plaintiffs were unable to irrigate and raise their usual crop in 1976.

From evidence produced at trial, it also appears that during the years between 1972 to 1976, plaintiffs tried to resolve their problems by installing barriers across the

up-stream end of the north culvert in an attempt to raise the water level and force the flow back to the middle culvert. Vance Spencer removed these barriers, but during the same period installed and removed similar barriers to the culvert, ostensibly to apportion the water between the parties.

The disagreements between plaintiffs and defendants led to the filing of this law suit in 1977. In their original complaint, plaintiffs sought to enjoin defendants from diverting any waters from Dog Creek and from changing the channel of the creek. They also sought actual and punitive damages for the diminished 1976 hay crop and defendants' allegedly willful and oppressive behavior with respect to the exercise of plaintiffs' water use, but the claim for damages was waived before trial. More importantly, plaintiffs sought a decree that they were entitled to 500 miner's inches of the Dog Creek flow, based on William Spencer's 1899 claim, and all of the flow in excess of that claim (approximately 1,000 miner's inches) based on prescriptive use over the statutory period. Plaintiffs also sought an easement for construction and maintenance of the diversion system located on defendants' land. Defendants eventually filed an answer generally denying all the allegations and claims made by the plaintiffs. (An amended answer, filed over four years later, raised more specific defenses and asserted affirmative claims, but it was disallowed by the court.) The Department of Natural Resources and Conservation was invited to intervene, but declined and waived receipt of further pleadings, claiming no substantial interest in the

outcome of the proceedings.

After nearly five years of additional pleading, pre-trial conferences, offers of settlement, and an unsuccessful attempt by defendants to obtain summary judgment, the case finally came to trial in March 1982. The court heard testimony from both sides concerning the nature of the dispute and plaintiffs' claims on the waters. After additional briefing, the court entered findings of fact and conclusions of law and entered a decree on July 28, 1982. The trial court decreed that plaintiffs had a right to 500 miner's inches of Dog Creek water, with a priority date of April 22, 1899, and an easement on defendants' land to maintain the diversion. The court found that plaintiffs had not acquired a prescriptive right to any amount of the waters in excess of 500 miner's inches. Further, the court concluded that there was insufficient evidence to show that defendants would interfere with plaintiffs' right in the future, and therefore denied the request for injunctive relief.

In its findings and memorandum accompanying the decree, the court elaborated on its conclusions with respect to the award of water rights. The court concluded that plaintiffs had failed to establish all of the elements of their prescriptive claim. Specifically, the court found no evidence that plaintiffs' use of any excess waters was hostile to that of defendants'. Plaintiffs did not show that they had used water when defendants and their predecessors had use of it; that defendants' or their predecessors' hay crops suffered from any lack of water for the prescriptive period; and that defendants or their

predecessors could have maintained a cause of action against plaintiffs for their use of the water. Moreover, the court found no evidence that plaintiffs had put any of the excess water to beneficial use on the land -- an important element of all appropriations, whether by prescription or not.

Plaintiffs moved to amend the findings and conclusions and to request a new trial, principally to present new evidence concerning the irrigation needs of the Northeast Quarter. Following a hearing, the court concluded that there was no basis to amend its earlier findings and conclusions and no statutory grounds for a new trial, and denied plaintiffs' motions.

On appeal, plaintiffs allege that the trial court erred by denying them a prescriptive right to 1,000 miner's inches of water from Dog Creek. Specifically, they assert that the element of hostility is not required under the allegedly unique facts of this case, and that the evidence before the trial court clearly preponderates in favor of a finding that plaintiffs made beneficial use of all the waters in Dog Creek. Defendants cross-appeal from the award of the 500 miner's inches, arguing that there is no evidence in the record to support such an award, and requesting that plaintiffs be limited to exactly one miner's inch per acre on their tract, or 160 miner's inches.

THE REQUIREMENT OF HOSTILE USE

When plaintiffs filed their initial complaint, they followed the theory that their prescriptive claim to the 1000 miner's inches could be granted only upon a successful showing of all the elements of prescription. However, during the course of trial and on this appeal, plaintiffs

altered their theory, insisting that proof of all elements -- especially a showing of hostile or adverse user -- is not necessary. To support this proposition, plaintiffs rely exclusively on our decision in Cook v. Hudson (1940), 110 Mont. 263, 103 P.2d 137, wherein, according to plaintiffs, we held that the mere uninterrupted use of water for the statutory period is sufficient to vest clear title in the user, without a showing of hostility. We now turn to our former decision to see if such a holding is readily discernable.

In that case, the plaintiff, Cook, filed an action to determine whether he or the defendant Hudson owned prior rights to the waters of Grove Creek in Stillwater County. Hudson answered on several grounds, but most importantly, argued that Cook's title was insufficient by virtue of a break in the claim of title between two of Cook's predecessors in interest. In addition, Hudson claimed a prescriptive right to the waters, predicated upon a showing that he and his predecessors had a record of continuous, notorious, and exclusive use over the statutory period adverse to Cook and his predecessors. Cook, supra, 110 Mont. at 268, 282, 103 P.2d at 139, 144.

The trial court, sitting with a jury, indulged a series of presumptions concerning ownership and possession, and concluded that there was no fatal break in the claim of plaintiff's title, and that defendant had not gained a right by prescription. 110 Mont. at 272-83, 103 P.2d at 141-46. With respect to the Cook title, however, plaintiffs in the immediate case point to the following language in the opinion to support their argument concerning hostile use:

> "On the question of prescriptive right,
> as applied in favor of the plaintiff's
> [Cook's] title, it is our opinion that
> Magee's [Cook's predecessor] undisturbed
> possession for a period of time in excess
> of the time necessary to acquire title by
> prescription, standing alone, was
> sufficient to vest clear title in him."

110 Mont. at 281, 103 P.2d at 145. (emphasis added) We then

cited sections 6817 and 6818, R.C.M. 1935 [now sections

70-19-406 and 70-19-405, MCA], presumably to bolster this

conclusion. The former statute provides that occupancy of

property for any period confers a title sufficient against

all except the state and those who have title by

prescription, accession, transfer, will, or succession. The

latter refers to obtaining title by prescription to property

occupied for the statutory period. With reference to the

former statute on simple occupancy, we then had this to say

concerning Cook's title to the water rights arising from

Grove Creek:

> "The only vital question that seriously
> affects plaintiff's title to the prior
> right initiated by Grant [one of Cook's
> predecessors] is the break in the record
> title heretofore mentioned . . . The
> right gained by Magee by his occupancy of
> the right to use of the water in
> accordance with section 6817.
> [70-19-406, MCA] cannot be successfully
> challenged after so long a time, and we
> can disregard any question as to whether
> Magee acquired [his predecessor's] right
> grounded on the Grant appropriation and
> still, within all recognized rules of law
> and equity, hold that Magee, upon his
> taking possession of the . . . squatter's
> claim, . . . using the waters at all
> times without let or hindrance as shown
> by the record, and bringing the land on
> which the water was used to patent,
> established a first right to the waters
> of Grove Creek against all others.
>
> "The clear preponderance of the evidence
> is to the effect that no one questioned
> the exercise of the first right to the
> waters of the creek by any owner or

-10-

> occupant of the land described in the
> complaint from and after Grant made the
> appropriation in 1892, until the
> defendant invaded the right of the
> plaintiffs in 1937 which resulted in this
> lawsuit."

110 Mont. at 281-2, 103 P.2d at 145-46.

From the above language, plaintiffs in the immediate case conclude that they have acquired title to 1,000 miner's inches of Dog Creek by virtue of uninterrupted use of these waters between 1901 -- the time the waters were first put to use -- and the mid-1970's -- the period when plaintiffs and defendants began feuding over the waters. The requirement of hostile or adverse use is mitigated by virtue of the long period of uninterrupted use. We re-emphasize that Cook is the only authority cited by plaintiffs to support their argument. And, at least one commentator has interpreted Cook to establish a new rule permitting a party to gain a prescriptive right. See Note, Water Rights: Prescriptive Right to the Use of Water in Montana, 3 Mont.L.Rev. 135, 139 (1942).

After carefully considering plaintiffs' argument, the trial court concluded that it did not read Cook to relieve plaintiffs from the burden of establishing hostile use. We concur with the trial court's judgment. We believe that plaintiffs have misconceived the Cook decision both in itself and within the entire context of Montana water law.

At the outset, we note that Cook, unlike plaintiffs in the immediate case, never asserted a prior right to the waters by prescriptive use. Rather, he sought to uphold his right only by a showing that he had title to the water right in conjunction with title to his land. See, Cook, supra, 110 Mont. at 268, 103 P.2d at 139. Furthermore, although it

-11-

is not entirely clear from the opinion, it does not appear that Cook's water right arose on the defendant's land, as is the situation in the case before us. A careful review of the opinion reveals that Cook was found to have title by occupancy and a chain of oral conveyances. Although there was an indication that his water right had not been mentioned in an early conveyance between two of his predecessors in interest, this Court indulged a series of statutory presumptions respecting possession and ownership and held that the water right had always been part of the interest in the land eventually acquired by Cook. See, 110 Mont. at 272-283, 103 P.2d at 141-46. Therefore, we do not believe that Cook can be read to support plaintiff's theory, as neither Cook nor this Court really maintained that he was attempting to preserve his right by a claim by prescription.

This observation, however, still does not explain the above-quoted language from Cook suggesting that a plaintiff like Cook could acquire a prescriptive right to the use of water with only a showing of continuous and uninterrupted use. Within the context of the whole opinion, we think the choice of language both unfortunate and confusing, and while there may be a simple explanation for it, we do not feel at liberty to comment on what our brethren really meant by this language forty-three years ago. Such second-guessing would do an injustice to the need for certainty in the law. Instead, we assume, for the purpose of argument, that the language represents a new rule of law concerning prescription. After making such an assumption, however, we reject any such rule as contrary to long-standing precedent

both within our jurisdiction and in our sister states that adhere to similar principles of water law.

Initially, we note that our decisions concerning acquisition of rights by prescription have always required any party alleging prescription to satisfy every element of the claim, including hostile or adverse user, and that a failure to satisfy any element is fatal to the entire claim. See, e.g., Smith v. Krutar (1969), 153 Mont. 325, 329-30, 457 P.2d 459, 461-62; King v. Schultz (1962), 141 Mont. 94, 100, 375 P.2d 108, 111; Havre Irrig. Co. v. Majerus (1957), 132 Mont. 410, 415, 318 P.2d 1076, 1078; Lamping v. Diehl (1952), 126 Mont. 193, 203, 246 P.2d 230, 235; Irion v. Hyde (1938), 107 Mont. 84, 88, 81 P.2d 353, 355; Verwolf v. Low Line Irrig. Co. (1924), 70 Mont. 570, 577, 227 P. 68, 70; Custer Con. Mines Co. v. City of Helena (1916), 52 Mont. 35, 44, 156 P. 1090, 1094; Smith v. Duff (1909), 39 Mont. 374, 378, 102 P. 981, 982; Bullerdick v. Hermsmeyer (1905), 32 Mont. 541, 544, 81 P. 334, 338; Talbott v. Butte City Water Co. (1903), 29 Mont. 17, 26, 73 P. 1111, 1113. In addition, we note that those western states adhering to the prior appropriation doctrine have also so held. See, e.g., Kountz v. Olson (1934), 94 Colo. 186, 29 P.2d 627; Church v. Stillwell (1898), 12 Colo.App. 43, 54 P. 395; Gilbert v. Smith (1976), 97 Idaho 735, 552 P.2d 1220; Determination of Relative Rights In and To the Waters of Franktown Creek (1961), 77 Nev. 348, 364 P.2d 1069; Hammond v. Johnson (1937), 94 Utah 20, 66 P.2d 894; Campbell v. Wyoming Development Co. (1940), 55 Wyo. 347, 100 P.2d 124, 102 P.2d 745. Thus, any rule relieving plaintiffs of the burden of satisfying any element of the prescriptive claim would be

contrary to the weight of precedent in Montana and other western states.

The mere fact that the claimant is a plaintiff claiming under a prior right makes no difference with respect to the requirements for satisfying prescription. Montana has not yet squarely addressed the law of prescription under these particular facts, but other prior appropriation states have never held that plaintiffs, claiming under prior right, need satisfy fewer or completely different elements. See, e.g., Campbell, supra, wherein the Wyoming Supreme Court held that:

> "the mere use of water, however long continued, does not give rise to a title by prescription. The plaintiffs [who were claiming title on the basis of prior rights] were, in addition, bound to show an invasion in a substantial manner of the rights of the [defendant], and the extent of that invasion during a continuous prescriptive period."

55 Wyo. 347, 102 P.2d at 748. The closest this Court has come to a specific consideration of a plaintiff's claim is apparent in O'Connor v. Brodie (1969), 153 Mont. 129, 454 P.2d 920. In that decision, the plaintiff, who had established a prior prescriptive right to waters associated with a ditch in the trial court, did not have to relitigate that claim on appeal, our ruling being confined to a determination of whether plaintiff had established a prescriptive right in the ditch. Nevertheless, in dictum, we said that, "the evidence relative to [proof of a prescriptive right in] the water line and diversion system would amply support specific conclusion [sic] that plaintiffs were owners of the water right by reason of title by prescription." 153 Mont. at 135, 454 P.2d at 924.

-14-

Because O'Connor was required to prove a prescriptive right in the system by establishing all elements of prescription, we deduce that he would have been required to make a similar showing for the water right itself.

To allow a plaintiff, or any party for that matter, the opportunity to obtain title to water rights by a showing of mere uninterrupted use would do a disservice to the sound precepts of western water law. Ideally, all water rights should be obtained in as orderly a manner as is humanely possible. Prescription does not contribute to the maintenance of an orderly system. Stone, Problems Arising Out of Montana's Law of Water Rights, 27 Mont.L.Rev. 1, 17 (1965). Indeed, we recognize that, with respect to water rights based on claims made after July 1, 1973, acquisition of title by prescription is not permitted. See, section 85-2-301, MCA. We think this observation is akin to the time-honored proposition that one claiming title to property under adverse possession must bear a heavy burden to show that his use of the property is continuous, hostile, actual, notorious, and exclusive to the owner of record, for one who has legal title should not be forced to give up what is rightfully his without the opportunity to know that his title is in jeopardy and that he can fight for it. Water rights are much too precious to forego without a showing of hostile or adverse use. No use of water by the plaintiffs in this case can be said to be hostile or adverse to the defendants unless such use actually deprived the defendants of the water when they actually had need of it. Otherwise, the defendants would lose something shared with plaintiffs under conditions where sufficient water was available for

everyone's use.

In summary, we hold that the weight of authority demands that any party attempting to claim title to a water right must satisfy every element of the prescriptive claim. To the extent that Cook may have announced a different rule, then, we expressly disapprove of any language in that opinion or interpretations arising therefrom which would articulate such a different rule.

On appeal, plaintiffs have apparently not argued in the alternative that, given a legal requirement to show hostility, sufficient proof of hostile or adverse use was established before the trial court. This being the case, plaintiffs cannot claim a prescriptive right to an additional 1,000 miner's inches of Dog Creek. If plaintiffs wish to claim any or all of these waters, they will have to adhere to the requirements of sections 85-2-301, MCA, et seq., relating to applications for appropriation.

THE QUESTION OF BENEFICIAL USE

As noted previously, the failure of plaintiffs to establish adverse user defeats their entire claim to the 1,000 miner's inches. Therefore, we need not address the issue of whether plaintiffs proved beneficial use of the same sum. Nevertheless, defendants have cross-appealed as to the award of the first 500 miner's inches from Dog Creek, claiming there is no evidence to support beneficial use of that sum by the plaintiffs. Before turning to this issue, however, we address plaintiffs' argument that defendants are somehow estopped from challenging the award of 500 miner's inches on appeal.

Plaintiffs claim that defendants have always

recognized the validity of a prior right to 500 miner's inches in plaintiffs, and that a challenge to this right is estopped on appeal. Specifically, plaintiffs refer to certain sections of a motion for summary judgment made by defendants during the course of pre-trial proceedings. In an affidavit supporting the motion, defendant Vance Spencer stated that he "always recognized the prior 500 inch Grimsley right . . ." Similarly, in a memorandum supporting the motion, defendant's attorney stated that, "[d]efendant Vance Spencer's affidavit establishes clearly that plaintiffs have a recorded 500 inch water right in Dog Creek . . ." Finally, plaintiffs point to certain statements in requests for admissions filed by defendant's attorney which impliedly recognize a "recorded 500 inch Grimsley right . . ." Plaintiffs argue that these statements from the pleadings, taken together, indicate recognition of the right and prevent defendants from asserting otherwise on appeal. That a party is bound by his pleadings needs no further elucidation. See, Fey v. A. A. Oil Corp. (1955), 129 Mont. 300, 285 P.2d 578.

Upon a thorough examination of all the pleadings, as well as the statements of attorneys at trial, we believe that, contrary to plaintiffs' argument, the 500 inch claim was generally in dispute from the beginning. Defendants' initial answer to plaintiffs' complaint contained a general denial of all of plaintiffs' claims, which included an assertion of the 500 inch right. Clearly, the claim to that much water was material to the proceedings, and the effect of an answer generally denying the claims of a plaintiff has the effect of putting every material allegation in dispute.

-17-

Davis v. Sullivan (1936), 103 Mont. 452, 62 P.2d 1292. Furthermore, pre-trial memoranda submitted indicate that defendants were willing not to contest plaintiffs' claim to 500 miner's inches if plaintiffs were willing to settle other aspects of the lawsuit. These statements do not constitute admissions. And, during trial, defendants and their counsel took great pains to refer to plaintiffs' "claim" as simply that and nothing more.

Moreover, the conduct of plaintiffs' attorney at trial and the analysis of the trial court contained in the findings of fact further persuade us that defendant is not now changing his legal theory of the case. We note that defendants' summary judgment materials -- the focus of plaintiffs' concern -- were filed in early 1979. Pleadings submitted and arguments made by defendants after 1979 make it abundantly clear that the 500 inch claim was in dispute. Yet we find no indication in the record that plaintiffs did not know about defendants' arguments. Neither is there any indication that plaintiffs ever objected to this alleged change in strategy. Admittedly, the assertion by defendants that plaintiffs were not entitled to all of the 500 inch claim was perhaps most clearly stated in an amended answer stricken by the court as improperly filed. But in its memorandum accompanying its decree, the trial court stated that, "except for the affirmative claim of defendants to a prescriptive right to the use of water not beneficially used by plaintiffs, it appears that issues raised by defendants [in the amended answer] are triable under the general denial of the original answer." We think this observation by the trial court constitutes further evidence that defendants

-18-

fully intended to dispute plaintiffs' claim to the first 500 inches of water in Dog Creek.

In any event, defendants were not in a legal position to admit that plaintiffs had a "right" to waters in the creek. Plaintiffs had a burden to prove that they had put the original Spencer claim to a beneficial use, and only when the trial court was satisfied that plaintiffs had sustained their burden would the claim ever ripen into a true right. Defendants could certainly choose not to contest the priority of any claim to the waters, and they could also opt not to dispute the granting of 500 miner's inches in exchange for a settlement, but these options did not relieve plaintiffs of their burden to show beneficial use to obtain a right.

Construing all the pleadings, statements of counsel at trial, and observations of the trial court together, we find no reason to believe that defendants are now taking a position contrary to their approach both before and during trial. Defendants have never disputed that plaintiffs have a prior right to some of the waters of Dog Creek, and that appears to be the substance of the defendants' position in the motion for summary judgment in 1979. Defendants' assertion that plaintiffs are not entitled to the sum of 500 inches of the waters of Dog Creek is not a new issue. They are entitled to question now, as they did during trial and in their subsequent post-trial briefs, the award of that sum to the plaintiffs by the trial court.

This is an equity case. In examining the trial court's decree, we are entitled to review all questions of fact arising upon the evidence in the record, and determine

-19-

the same, as well as questions of law, unless for good cause a new trial or the taking of further evidence in the court below be ordered. Section 3-2-204(5), MCA. In so doing, however, we have always indulged certain presumptions in favor of the trial court's determinations. We do not substitute our judgment for that of the trial court; rather, we determine whether there is substantial evidence to support the lower court's findings. Bagnell v. Lemery (Mont. 1983), 657 P.2d 608, 40 St.Rep. 58; Shanahan v. Universal Tavern Corp. (1978), 179 Mont. 36, 39, 585 P.2d 1314, 1316. By "substantial evidence," we mean that evidence which:

> "will convince reasonable men and on which such men may not reasonably differ as to whether it establishes the plaintiff's case, and, if all reasonable men must conclude that the evidence does not establish such case, then it is not substantial evidence. The evidence may be inherently weak and still be deemed 'substantial' . . . [citations omitted]."

Olson v. Westfork Properties, Inc. (1976), 171 Mont. 154, 158, 557 P.2d 821, 823. We will not overturn the trial court's findings unless there is a clear preponderance of evidence against them, and we will review the evidence in a light most favorable to the prevailing party. Cameron v. Cameron (1978), 179 Mont. 219, 228, 587 P.2d 939, 945.

Clearly, the evidence presented by plaintiffs to justify a prior right to any quantity of water from Dog Creek was, to say the least, very sparse. Yet the trial court found that 500 miner's inches -- the amount specified in William Spencer's 1899 claim -- was "reasonably required" for irrigation purposes. The court based its decision on the following "circumstances":

"a. That is the quantity for which William R. Spencer filed on April 22, 1899, from which this Court infers that experience as of that date led Spencer to specify that quantity.

"b. The soil in the area is permeable to moderately permeable, from which the Court infers that more than the usual one-inch per acre is reasonably required for penetration.

"c. The Dog Creek flow comes fast when it comes, and 'dies quick,' so that the water must be so used as to give the soil a maximum soaking when the water is available.

"d. A strong flow of water is required to cover the 160 acres by means of the dike and ditch system of the Grimsleys."

Findings of Fact No. 13. In its memorandum accompanying the decree and findings, the court reiterated these circumstances to justify the award.

With respect to the first circumstance, we note initially that this, by itself, does not support the award. Statements made in notices of appropriation, while important to establishing a prima facie case for the sum of water claimed, are not entirely dispositive for the purpose of transforming the amount claimed into a right. Holmstrom Land Co. v. Meagher County Newland Creek Water Dist. (Mont. 1979), 605 P.2d 1060, 1065, 36 St.Rep. 1403, 1408-09, Irion v. Hyde (1938), 107 Mont. 84, 95-96, 81 P.2d 353, 358. Moreover, the trial court's inference is not supported by the evidence. As the court noted in another finding of fact, Spencer did not cultivate hay until 1901, nearly two years after the notice of appropriation was filed. There is no evidence in the record to indicate what experience he had in 1899, and whether he could justify a claim of 500 miner's inches for use on a hay crop that would not even be

developed until two years later.

Based on the available evidence, however, we cannot say that the remaining circumstances fail to support the trial court's decree. The testimony of the several lay witnesses, although admittedly very general, is not so inherently unreasonable as to warrant reversal. We recognize that a scientific evaluation of the soil and the requirements for cultivation is lacking, but we have often recognized that the claims and observations of those who work the land may be more important than the assessements of expert technicians. As we said in Federal Land Bank v. Morris (1941), 112 Mont. 445, 453, 116 P.2d 1007, 1010,

> ". . . the testimony of the men on the land, who know the soil, the kind of crops that can be raised on it, and who have spread the water and dug into that soil, and watched the effect during the entire growing season, brings in evidence of considerable weight [as opposed to the opinions of experts]."

Here, there is substantial evidence, based on the observations of key witnesses, that the water applied to plaintiffs' land helped produce some of the best blue-joint hay in the Sun Prairie community, and that soil conditions and waterflow patterns warranted application of about 500 miner's inches of Dog Creek water, each time the water was available, in order to insure an annual crop. We are unwilling to disparage these observations, based as they are on years of experience in working and irrigating the land. Defendants have not pointed to anything in the court's findings of fact that is "clearly erroneous" within the meaning of Rule 52(a), M.R.Civ.P., save the facts surrounding the first circumstance for justifying the award.

We find that this error is insignificant in the context of all of the trial court's findings.

Accordingly, the judgment of the trial court awarding priority of 500 miner's inches to plaintiffs and denying a prescriptive right to the remaining 1000 miner's inches is affirmed.

_____
Justice

We concur:

_____
Chief Justice

_____

_____

_____
Justices